UNITED STATES of America, Appellee,

v.

Edward Joseph WEDELSTEDT,
Appellant.

No. 77–1965.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1978.

Decided Dec. 15, 1978.

Rehearing Denied Jan. 9, 1979.

C. A. Frerichs of Fulton, Frerichs, Nutting & Martin, Waterloo, Iowa, for appellant.

James H. Reynolds, U. S. Atty., Cedar Rapids, Iowa, for appellee.

Before ROSS and HENLEY, Circuit Judges, and MARKEY,* Chief Judge.

ROSS, Circuit Judge.

Edward Joseph Wedelstedt, appellant herein, was convicted in September 1977 on three counts of a five count indictment.[1] His offenses relate generally to his dealings in stolen movie films, both pornographic and nonpornographic. The evidence in the case has been described by the parties in terms of the two thefts—the "Shepard" transaction and the "Chicago" transaction.

A detailed explanation of the indictment is important in this case. Count one was a conspiracy count. It charged Wedelstedt with conspiring with three others, Bruce Gentry, Richard Dobler, and Dennis Leone, to commit various offenses against the United States between November 1, 1974 and December 16, 1974, at various named cities in Iowa, Illinois, and Missouri. The offenses which the conspirators were alleged to have agreed to commit were as follows: interstate transportation of goods of a value greater than $5,000, knowing the same to have been stolen, in violation of 18 U.S.C. § 2314; receipt, concealment, sale and disposition of goods of a value greater than $5,000 which "were a part of and constituted interstate commerce," knowing the same to have been stolen, in violation of 18 U.S.C. § 2315; the knowing transportation in interstate commerce, for sale and distribution, of obscene films in violation of 18 U.S.C. § 1465.

Eighteen overt acts in furtherance of the conspiracy were alleged under this count; although it is not completely clear, it appears that the first thirteen overt acts dealt with the "Chicago" transaction, and the last five with the "Shepard" transaction.

The remaining counts in the indictment, two through five, charged appellant with the commission of substantive offenses. In count two Wedelstedt was charged with aiding and abetting the interstate transportation of stolen goods (pornographic films from the "Chicago" transaction), in violation of 18 U.S.C. § 2314. This count was dismissed by the government during the course of the trial.

Count three charged appellant with the unlawful receipt and sale of stolen goods which were moving as, and were a part of, interstate commerce in violation of Sections 2 and 2315 (again, the "Chicago" films).

Count four charged the interstate transportation of obscene materials for purposes of distribution (the "Chicago" films) in violation of 18 U.S.C. §§ 2, 3, and 1465.

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. Appellant Wedelstedt was sentenced as follows: a five year term of imprisonment on count one; a five year term on count three, to run concurrently with count one; a three year term on count four, to run concurrently with counts one and three. Additionally, a $2,500 fine was imposed under count four, and a $5,000 fine under count one.

Count five related to the "Shepard" films, and charged the unlawful receipt, concealment, and sale of stolen goods which moved as a part of interstate commerce in violation of 18 U.S.C. §§ 2 and 2315. This count was also dismissed, on motion of defendant, for reasons which will be discussed later.

Prior to this federal prosecution, Wedelstedt had been convicted on state charges also arising out of the theft of the "Shepard" films.

The Shepard films were a collection of privately owned classic films. They were stolen in September 1974 in Davenport, Iowa from David Shepard and transported to Cedar Rapids, Iowa where they were received by appellant. They had been stolen and transported by Thomas Meade, who thereafter became an informer for the Iowa Bureau of Criminal Investigation (BCI), in exchange for immunity.[2]

Pursuant to a plan devised by Meade and the BCI, Meade informed Wedelstedt that he had located a buyer for the Shepard films; appellant thereafter arranged for the films to be transported in a U–Haul truck by his associates from one point in Iowa to another, where the alleged buyer was said to be waiting. Wedelstedt was told that the fictitious buyer, who was an agent, was from the West Coast, and would be transporting the films back there.

The "Chicago" transaction involved the theft from a Chicago warehouse of a large number of pornographic, or adult films. This theft occurred on December 8, 1974; the three thieves were Gentry, Leone, and Dobler, mentioned previously in the conspiracy count. They transported the films to Cedar Rapids, Iowa and delivered them to the appellant Wedelstedt. An earlier attempt of the theft by Meade (the informer) and Gentry, on November 23, 1974, had been aborted. At the time of the "Chicago" transaction, Meade was already an informer. Gentry, Leone, and Dobler pleaded guilty to one count of conspiracy.

Counsel for the appellant has diligently raised numerous issues, thirteen in all, many of which will not require extended discussion by the court. We have carefully examined the issues, however, and conclude the conviction should be affirmed.

## I. Shepard Transaction Conspiracy Count

The first three issues raised by appellant concern the "Shepard" transaction. The only count upon which appellant was convicted that concerns the "Shepard" transaction is count one, the conspiracy count.

Wedelstedt argues that the Shepard transaction as it occurred involved no violation of federal law, either as a substantive offense under § 2315, or as a conspiracy to commit that offense. He objects to the lack of an interstate nexus, his argument being that these particular films never left the state, never entered interstate commerce, and only traveled between two points in Iowa.

On this basis, the trial court initially dismissed all counts emanating from the Shepard transaction—the count for the substantive crime (count 5), and that portion of the conspiracy count (count 1) which related to the Shepard films. Later, however, the court reinstated the conspiracy count.[3]

Appellant's contention that an interstate nexus is lacking in the Shepard transaction is certainly not frivolous, but it is an allegation we feel it is unnecessary to reach in this case.

■ The conspiracy was alleged in a single count under the general federal conspiracy statute. Wedelstedt received but one sentence on that count, despite the fact that several illegal objects of the conspiracy, that is violations of several federal statutes, were alleged. Therefore, proof that Wedel-

---

**2.** Meade was one of the employees in one of Wedelstedt's businesses, International Amusements.

**3.** The trial judge rejected the attempt to permit a substantive offense under § 2315 to be charged on these facts, and was unpersuaded, as are we, by the case the government continues to rely upon here, which construes a statute prohibiting the interstate transportation of firearms by a felon.

stedt agreed to commit one of the multiple illegal objectives of the conspiracy sufficed to sustain the conviction on that count.

It has always been the law that where an indictment alleges a conspiracy to commit several offenses against the United States, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses. (Citations omitted.)

*United States v. James,* 528 F.2d 999, 1014 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). *See also United States v. Mackey,* 571 F.2d 376, 387 n. 14 (7th Cir. 1978); *United States v. Frank,* 520 F.2d 1287, 1293 (2d Cir. 1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). *But see United States v. Baranski,* 484 F.2d 556, 560–61 (7th Cir. 1973). Though this principle is usually applied in the context of a failure of proof as to one object of the conspiracy, it is as applicable where one of the objectives charged is not a criminal act:

In *United States v. Mack,* 112 F.2d 290 (2 Cir. 1940), this court, speaking through Judge Learned Hand, held that where an indictment charged a conspiracy to engage in three offenses and only one was proved, the conviction could still stand. We have recently followed that decision in *United States v. Papadakis,* 510 F.2d 287, 297 (2 Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975), subject to a caveat not here applicable, and in *United States v. Frank,* 520 F.2d 1287, 1293 (2 Cir. 1975). Although in these cases all the objectives charged in the conspiracy count were crimes and the defect was a failure of proof as to some, other circuits have reached the same result when some of the objectives were not crimes, *Moss v. United States,* 132 F.2d 875 (6 Cir. 1943); *United States v. Tanner,* 471 F.2d 128, 140 (7 Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). Although the Seventh Circuit, speaking through Judge Pell, has recently questioned the correctness of this line of authority on the ground that a reviewing court cannot tell what offense or offenses alleged in a conspiracy indictment were found by the jury, *United States v. Baranski,* 484 F.2d 556, 559–61 (1973), here we know from the conviction on Count II that the jury found that Dixon had committed the offense validly charged in the conspiracy count. Cf. *United States v. Bottone,* 365 F.2d 389, 394–95 (2 Cir.), *cert. denied,* 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966); *United States v. Jacobs,* 475 F.2d 270, 282–84 (2 Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 131, 38 L.Ed.2d 53 (1973). There is thus no basis for questioning the conviction on the conspiracy count.

*United States v. Dixon,* 536 F.2d 1388, 1401–02 (2d Cir. 1976). *See also United States v. Tanner,* 471 F.2d 128, 139–40 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972).

In this case three illegal objects were alleged: two clearly dealt only with the "Chicago" transaction; the other, a conspiracy to violate § 2315, could relate to either the "Shepard" or the "Chicago" thefts. Significantly, however, appellant Wedelstedt was also convicted of the *substantive* crime under section 2315 for the Chicago theft.

"The only caveat in such cases is that an overwhelming amount of evidence relevant only to the unproved part of the conspiracy may have prejudiced the jury." *United States v. Papadakis,* 510 F.2d 287, 297 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). In this case a considerable amount of evidence relevant to the Shepard transaction was introduced; this evidence, however, was separate and distinct from the proof of the Chicago conspiracy, which in any event formed the basis for most of the allegations in the conspiracy count. Wedelstedt does not challenge the sufficiency of the evidence to support the "Chicago" conspiracy allegations, and in fact the proof appears adequate. Accordingly, we sustain the count one conviction, and do not reach the federal

issue presented by the solely intrastate transfer of the Shepard films.[4]

## II. Petite Rule Violation and Take-Back Entrapment

Wedelstedt alleges first that the Department of Justice violated its internal rule on multiple state-federal prosecutions for conduct arising out of the same transaction, known as the Petite policy, and secondly, that this court should defer its decision here until the Iowa Supreme Court has had the opportunity to rule on Wedelstedt's claim of "take-back" entrapment, a legal defense recognized under Iowa law. The latter issue need not be addressed; the Iowa Supreme Court has ruled against Wedelstedt on the entrapment issue in the Shepard theft conviction. *State v. Wedelstedt,* 263 N.W.2d 894, 900–01 (Iowa 1978).

■ The Justice Department's violation of its own rule similarly does not merit a reversal of any count against Wedelstedt. The rule which originated in 1959 "indicated that both federal and state prosecutions should not be pursued without approval of the Attorney General." *United States v. King,* 590 F.2d 253, 256 (8th Cir.

1978). However, "[t]he enforcement of such policy, if still in effect, lies with the Attorney General and an individual defendant cannot avoid prosecution on the basis of this policy. No cases have been cited which support the right of an individual to seek a dismissal on the basis of the *Petite* policy." *Id.* In the instant case moreover appellant has not been prejudiced because we affirm his conviction on each count without reference to proof of the Shepard offense. The Shepard count was the sole basis of the state conviction.[5]

## III. Motion for Judgment of Acquittal on Count Four

■ Count four charged Wedelstedt with aiding and abetting the interstate transportation of obscene materials for sale or distribution (the Chicago films) in violation of 18 U.S.C. §§ 2, 3, and 1465.[6]

It is Wedelstedt's position that the evidence conclusively demonstrated his ignorance of the theft at the Chicago warehouse at the time that it occurred, and that he only subsequently learned that the films had been transported across state lines by Gentry, Dobler, and Leone.

---

**4.** *Misjoinder of Offenses in the Indictment.*

Wedelstedt also alleges that the "Shepard" and "Chicago" offenses were improperly joined in the same indictment, and that evidence of the Shepard transaction improperly influenced the jury in convicting on the other counts. The indictment shows no facial misjoinder. "Where the evidence overlaps and the offenses are similar and occurred over a relatively short period of time, joinder is usually proper." *United States v. Riley,* 530 F.2d 767, 770 (8th Cir. 1976). *See also United States v. Hastings,* 577 F.2d 38, 40 (8th Cir. 1978). Wedelstedt "did not take the stand nor does he contend that he would have done so if the counts had been tried separately." *United States v. Lewis,* 547 F.2d 1030, 1033 (8th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977). Reversal is required only when clear prejudice is shown. The evidence of guilt on the "Chicago" counts is sufficient, and the trial judge appropriately admonished the jury to consider each crime and the evidence pertaining to it separately. *See United States v. Jines,* 536 F.2d 1255, 1257 (8th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 361, 50 L.Ed.2d 312 (1976).

**5.** The Department of Justice approved the prosecution under its Petite policy, *ex post facto.* It based its approval on the fact that the defendant had been convicted in state court on charges which were only intrastate in character. If the United States Attorney had sought the required approval prior to trial it is probable that references to the Shepard transaction could have been eliminated in the proof of the conspiracy.

**6.** § 1465. Transportation of obscene matters for sale or distribution

Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

It is axiomatic that:

> In assessing a motion for judgment of acquittal, either at the end of the government's case or after a jury verdict against the defendant, the evidence must be viewed in the light most favorable to the government. *Furthermore, the government must be given the benefit of all reasonable inferences favorable to its case that may logically be drawn from the evidence.*

*United States v. Cline,* 570 F.2d 731, 733 (8th Cir. 1978) (emphasis added). We have also said that "[a] motion for acquittal should be granted only where 'the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of any of the essential elements of the crime charged.' " *United States v. White,* 562 F.2d 587, 589 (8th Cir. 1977).

In *United States v. Frye,* 548 F.2d 765 (8th Cir. 1977), where the crime was aiding and abetting the transportation of a check in interstate commerce in violation of § 2314, the court explained the principles which define the aiding and abetting offense:

> Generally speaking, to find one guilty as a principal on the ground that he was an aider and abetter, it must be proven that he shared in the criminal intent of the principal and there must be a community of unlawful purpose at the time the act is committed. As the term "aiding and abetting" implies, it assumes some participation in the criminal act in furtherance of the common design, *either before or at the time the criminal act is committed.* It implies some conduct of an affirmative nature and mere negative acquiescence is not sufficient.

*United States v. Jarboe,* 513 F.2d 33, 36 (8th Cir. 1975), *cert. denied,* 423 U.S. 849, 96 S.Ct. 90, 46 L.Ed.2d 71 (1976).

*Id.* at 768 (emphasis added). In sum, the government need show only that a defendant associated himself with a venture, and sought by his action to make it succeed. *United States v. Buttorff,* 572 F.2d 619, 623 (8th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978).

Wedelstedt's principal contention is that he gave no direct assistance to the three thieves, nor did he do anything which could be inferred as an act of assistance. Specifically, Wedelstedt argues that all three principals testified that the theft was carried out without his knowledge, and that two of the principals had never met him until after the theft was accomplished.

We have carefully reviewed the testimony of Gentry, Dobler, Leone, and Meade. According to the testimony of Meade and Gentry, it was Wedelstedt who knew of the films in the Chicago warehouse, and Wedelstedt who suggested that Meade and Gentry steal them and that he would buy them.[7] These two then attempted the burglary on November 23, but were unsuccessful.[8]

When Meade and Gentry returned to tell Wedelstedt that it was too risky to attempt the theft, Meade added that they "would return at some later date and try again."

Q (Government) What was Mr. Wedelstedt's response?

A He was a little bit upset but he said, "Okay."

Gentry's testimony corroborated this conversation exactly.

It was Gentry who decided to steal the films on December 8. He did not include Meade, his former partner, but called upon two friends who had not met Wedelstedt. After the theft, Gentry, Dobler and Leone drove directly to Wedelstedt's home in Iowa with the films, stayed there all night, and were paid for the films the next day by

---

7. Q Who brought up the subject?
   A Mr. Wedelstedt.
   Q In what manner did he bring it up?
   A Asked us if we wanted to make some money, he said that there was a building that would be easy to get into that contained

thousands of films and he would be willing to buy them from us if we stole them.

8. The burglary was foiled by the BCI, because the agency did not want to involve their informer Meade in further criminal activity.

Wedelstedt. However, Gentry testified that Wedelstedt was unaware that he and the others were going to carry out the theft at the time they did, on December 8.

Viewing the evidence in the light most favorable to the government, we find no error. The jury was free to conclude that Wedelstedt instigated the idea of stealing pornographic films in Chicago and returning them to Iowa. Wedelstedt directed the first unsuccessful theft, and okayed the idea that it be tried later. When Gentry decided later to try again, without Wedelstedt's knowledge, he knew he had a ready delivery point for the stolen film, a general price established, and an approving buyer. As Dobler testified: "I got the feeling that Mr. Gentry knew he could get rid of the material that we were going to take * *." We cannot say a jury could not find Wedelstedt guilty of "some participation in the criminal act in furtherance of the common design, either before or at the time the criminal act is committed." *United States v. Frye, supra,* 548 F.2d at 768. The count four conviction is sustained.

*IV. Suppression of Exhibits 79 and 54–78*

Exhibit 79 is a list of adult films compiled by Dale Lavin, an employee of Wedelstedt. Lavin compiled the inventory list at Wedelstedt's direction, and the films on the list correspond to the films seized at the warehouse and introduced into evidence as exhibits 54–78. It was the government's contention at trial that exhibits 54–78 were the stolen "Chicago" films. The list came into the government's hands through the informer Meade, who saw it attached to a box of films that Lavin was inventorying, and "suspected" it pertained to the films from Chicago.

Appellant alleges that the exhibit was illegally seized without a warrant in viola-

tion of the fourth amendment, that it was stolen by Meade, and that Meade's actions should be attributable to the government because he was acting as an informer for the government at the time.

Appellant moved to suppress the list in a pretrial motion, but the motion was denied. The government argues that appellant failed to preserve the objection.

"It is quite true generally that the overruling of a pretrial motion to suppress the use at the trial of particular evidence preserves the point and renders it unnecessary again to object when such evidence is offered at the trial." *Lawn v. United States,* 355 U.S. 339, 353, 78 S.Ct. 311, 319, 2 L.Ed.2d 321 (1958). The issue here, however, is whether appellant's counsel thereafter "consciously and intentionally waived any objection to their receipt in evidence." *Id.* at 355, 78 S.Ct. at 320.

■ Pretrial objections have been waived by a defendant's counsel who affirmatively stated "no objection" to the introduction of evidence he previously sought to have suppressed, *United States v. Mireles,* 570 F.2d 1287, 1290 (5th Cir. 1978); *United States v. Adams,* 422 F.2d 515, 518 (10th Cir.), *cert. denied,* 399 U.S. 913, 90 S.Ct. 2213, 26 L.Ed.2d 569 (1970), or, who used the evidence for his purposes and then stated he had "no objection" to its introduction. *Lawn v. United States, supra,* 355 U.S. at 354, 78 S.Ct. 311.

Government exhibit 79 is identical to what defendant offered as exhibit A. Counsel for appellant was the *first* to introduce this exhibit into the trial, during his cross-examination of the government witness David Hintermeister. Soon after, exhibit 79 was introduced into evidence with appellant's counsel stating "no objection."[9] Later, when the trial had ended, counsel

---

**9.** A very similar colloquy occurred when exhibit 2-D was offered into evidence. Exhibit 2-D is merely the search warrant with exhibit 79, the inventory list, attached.

    THE COURT: My record doesn't—I think you stipulated to it, but it has never been offered.

    THE CLERK: That is what I have.

    THE COURT: Two-D, did you wish to offer it, Mr. Kirshen? You had discussion about it.

    MR. KIRSHEN: I had assumed that.

    MR. FRERICHS [Appellant's counsel]: I assumed it was in.

    MR. KIRSHEN: I assumed likewise.

    MR. FRERICHS: I will stipulate the foundation, Your Honor, and we would offer it.

renewed the motion to suppress "on all grounds heretofore urged on the Court * * *."

■ We think the argument is fairly made that the objection was waived; however, we need not rest our decision on that basis alone. Assuming *arguendo* that the search was illegal, we do not feel its commission can fairly be attributed to the government. The testimony at trial and at the pretrial suppression hearing indicates that the government did not solicit Meade to get the film list, or seize anything, and did not know that the film list existed. Meade testified that his decision to take the list was unplanned:

Q. Where did you get it?

A. It was attached to the boxes of film that Mr. Lavin was inventorying.

Q. What did you do with the list?

A. I took the list and gave it to the agents.

Q. One of the BCI agents?

A. Yes.

Q. Was this a spur-of-the-moment thing?

A. Yes, it was. It wasn't planned out.

Q. The agents hadn't asked you to get the list, had they?

A. No.

Q. What did you tell the agents about this list?

A. I told them that—circumstances of how I saw the list and talked to Lavin, and I—Well, I can't say I knew, but I suspected these were the films from Chicago and I decided to get that list, figuring that it would be helpful to them.

At the time Meade took the list, he was an employee of Wedelstedt, providing information to the government about Wedelstedt in exchange for immunity from prosecution. However, there is no evidence that any federal or state agent "directed, authorized

or knew" of the seizure by Meade. *United States v. Luciow,* 518 F.2d 298, 300 (8th Cir. 1975). In *Luciow,* the informer made an allegedly illegal entry and search. The defendant sought to suppress the evidence obtained, but the court found no violation of the fourth amendment: "Before * * action can be attributed to the government, some degree of government instigation of the illegal entry must be shown." *Id.*

Here, there was no evidence that the seizure was conducted "with government knowledge and consent, tacit or explicit * * *." *United States v. Mekjian,* 505 F.2d 1320, 1328 (5th Cir. 1975). The district court's detailed findings of nongovernmental involvement are not clearly erroneous.[10] Absent governmental involvement, there is no error in the admission of the exhibit. *Id.* at 1327. *See also Gunlach v. Janing,* 536 F.2d 754, 755 (8th Cir. 1976).

According to appellant, exhibits 54–78 were also erroneously admitted. This contention is premised on two independent arguments: first, because the state court in a post-seizure statutory hearing invalidated the search warrant it had previously issued, appellant argues that "considerations of the doctrines of comity, issue preclusion, due process, and those judicial considerations set forth in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) preclude a federal court from nullifying a state court decision in respect to the unconstitutionality of a state seizure made through state processes." Secondly, appellant contends that on the merits the state court was correct in ruling that probable cause was lacking on the face of the affidavit.

Both arguments lack merit. For collateral estoppel to bar a criminal prosecution, if it were even applicable to this issue, "both adjudicatory entities must be arms of the same sovereign * * *." *United States v. Kills Plenty,* 466 F.2d 240, 243 (8th Cir.

---

10. At a pretrial evidentiary hearing agent Marlin testified extensively about the arrangement with Meade. Marlin said that he never suggested that Meade seize anything; Meade was supposed to provide information, particularly by means of the transmitter he wore, corroborating the criminal activity Meade had told police about. Meade was to receive immunity for certain crimes in exchange for the information and testimony he would provide. Meade was not granted immunity until the day of the trial. Meade received no salary, and was only paid for expenses he incurred.

1972), *cert. denied,* 410 U.S. 916, 93 S.Ct. 971, 35 L.Ed.2d 278 (1973). The conviction appealed from here is a federal conviction for federal crimes.

■ A federal court is not bound for reasons of comity by a state court's assessment of a warrant:

> While it is not entirely clear whether the state court relied on federal or state law as authority for its holding [that the warrant was unconstitutional], we are not, in any event, bound by its decision. "In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States,* 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960).

*United States v. Bedford,* 519 F.2d 650, 654 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed. 323 (1976). Finally, *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) was meant to accord deference to state court search and seizure determinations where a *state* court defendant attacked his *state* conviction in a federal forum in a § 2254 collateral attack. *See Shane v. Iowa,* 581 F.2d 727 (8th Cir. 1978). It is inapplicable in this appeal of Wedelstedt's federal conviction.

■ Further, we disagree with the state court that probable cause to search the warehouse was lacking and that the ensuing warrant was unconstitutional.

The affidavit of agent Michael Marlin provided *inter alia:*

> On or about the 8th of December, 1974 a thaft [sic] occured [sic] in Chicago Illinois where more than 1000 8 millimeter pornographic films were stolen from a warehouse. Meade was originally asked by Wedelstedt to take part in this theft but did not do so. These films have since been observed by Meade at the warehouse at 311 9th Ave. S. E.: Cedar Rapids, Iowa. This theft was done at the direction of Wedelstedt, by his employees. This affiant overheard a conversation between Meade and Wedelstedt on the ___ day of December, 1974 where Meade said "How come you ripped of [sic] the films without me" and Wedelstedt said "I gave you a chance and you didn't want to do it" Meade than [sic] said "Did you give them (meaning the thieves) $2 a film as our deal was" and the remainder of that portion of the conversation was unintelligable [sic]. A complete list of these films is attached hereto marked Exhibit B.

> On December 13, 1974 the informant, thomas Meade advised that from his observation at the warehouse 311 9th Ave S. E. the film stolen from Chicago, a poloroid [sic] camera taken in the Sheppard [sic] burglary, Electronic desk computer, univac, stolen in the State of Utah, a [sic] adding machine also from Utah were present at that location.

The affidavit further states that Meade is Wedelstedt's employee; that he is under indictment for arson; that the averments he makes to affiant are against his penal interest, and that Meade fears for his safety because of threats Wedelstedt has made against others. Finally it is averred that Meade has provided reliable information in the past which was corroborated by independent investigation and monitoring of Meade's conversations with Wedelstedt. The standard for assessing the adequacy of a tip is a familiar one:

> To form an adequate basis for a finding of probable cause, an informant's hearsay tip must reveal (1) some of the underlying circumstances from which the informant concluded that the narcotics were located where he claimed they were, and (2) some of the underlying circumstances from which the officer concluded that the informant was credible and his information reliable. *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

*United States v. Regan,* 525 F.2d 1151, 1155–56 (8th Cir. 1975). The basis of Meade's tip that the illicit films were in the warehouse was his personal observation of them. He specified the place at which he saw them, and the date. Attached to the affidavit was an inventory list of the films he had observed. "[T]he informant's statement that she had *personally* observed the tablets at defendant's residence clearly satisfies the first of these requirements." *United States v. Gavic,* 520 F.2d 1346, 1350 (8th Cir. 1975) (emphasis added). *See also United States v. Marchildon,* 519 F.2d 337, 341 (8th Cir. 1975).

The second prong of the *Aguilar* test is satisfied as well. "The fact that an informant has previously given accurate information may be a sufficient test of his reliability." *United States v. Cummings,* 507 F.2d 324, 328 (8th Cir. 1974). In this case such an averment was made, and Meade was identified by name. Moreover, Meade related to the agent in great detail, all of which appears in the affidavit, his complicity in an arson offense which he allegedly committed at Wedelstedt's request. These statements were clearly against his penal interest, and provide "an additional reason for crediting the informant's tip." *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971).

The basis of Wedelstedt's main objection is the first sentence of the quoted portion of the affidavit: "On or about the 8th of December, 1974 a thaft [sic] occured [sic] in Chicago Illinois where more than 1000 8 millimeter pornographic films were stolen from a warehouse." Appellant argues that this statement misleadingly appears to have come from official sources, though testimony at the suppression hearing established that the theft had never been reported, and that Meade was also the source of this statement. We agree with appellant that it is not clear that Meade, and not the affiant, was the source of this statement, and that it should have been made clearer. However we do not think this is fatal, and we will assess this statement with the assumption the informer was its source.

Other information in the affidavit supplied by Meade provides adequate underlying circumstances for inferring that these were stolen, pornographic films from Chicago. According to the affidavit, Meade had originally been asked to take part in the theft, and it may logically be inferred that he knew where the films were from and what it was he had been asked to steal—8 millimeter pornographic movies. More importantly, however, the affidavit relates that a theft of films had actually taken place, and this fact was corroborated by a conversation between Wedelstedt and Meade about the theft, which was overheard and restated by the affiant himself. These facts, linked with Meade's personal observation of the 8 millimeter films on December 13, are sufficient to support the initial statement. We have often said that an "affidavit need only establish the *probability* of criminal activity and secreting of evidence on specific premises, not proof beyond a reasonable doubt." *United States v. Smith,* 462 F.2d 456, 460 (8th Cir. 1972).

We conclude that the search was based on an adequate showing of probable cause, and the admission of the seized films was proper.

## V. Instructions to Jury on Conspiracy; Aiding and Abetting

Next, appellant challenges the jury instructions, and specifically charges that the trial court failed to instruct on his theory of defense to the charges of conspiracy, and of aiding and abetting the interstate transportation of obscene materials.

The court gave five instructions relating to conspiracy which completely covered the applicable legal principles on conspiracy. "[T]he court retains discretion in *framing* the instruction; it is therefore sufficient that the charge to the jury adequately and correctly covers the *substance* of the requested instruction." *United States v. Brown,* 540 F.2d 364, 380 (8th Cir. 1976) (emphasis added).

One requested instruction not included, however, related to abandonment of the conspiracy, and would have instructed the

jury that it must find defendant "not guilty" if the conspiracy had been abandoned at the time Gentry, Leone, and Dobler agreed to steal the films. We do not think the evidence justified such an instruction; there is no evidence that the illegal object of the agreement was surrendered when the first theft was frustrated—it was in fact later carried out. Further, and more precisely, there was no evidence that Wedelstedt withdrew from the conspiracy. "[W]ithdrawal requires some affirmative action tending to defeat or disavow the purpose of the scheme, and the abandonment must be complete and in good faith." *United States v. Nowak,* 448 F.2d 134, 139 (7th Cir. 1971).

Additionally we believe that it was not error to refuse appellant's two aiding and abetting instructions.[11]

The substance of the first requested instruction is covered in the court's lengthy aiding and abetting charge. The second, which states a correct legal principle, may be inferred from the instruction given which provides, *inter alia,* that a person aids or abets another in a crime "if he knowingly and willfully associates himself in some way with the criminal venture, with the intent to commit the crime, willfully participates in it as something he wishes to bring about, and willfully seeks by some action of his to make it succeed."

Moreover,

> Instructions are not a substitute for argument to the jury. If the judge fairly instructs the jury as to applicable principles of law so as to allow counsel on each side sufficient latitude to argue what he considers to be key points in his case, the trial judge has performed his duty. It is neither required nor appropriate for the judge to accentuate any particular legal principle.

*United States v. Campanale,* 518 F.2d 352, 362 (9th Cir. 1975), *cert. denied,* 423 U.S.

1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). We have reviewed the instructions as a whole, and find no error.

## VI. Instructions on Obscenity

■ Wedelstedt's objections to the instructions explaining "community standards" and how "community standards" should be applied under the *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) test, are completely without merit. The court's thorough instructions on obscenity (instructions 14–18) clearly convey to the jury that the determination of "obscenity," which the jury must analyze under the three-part test set out in *Miller,* is not a matter of individual taste, but must be judged according to the "community standard."

■ Nor did the court commit reversible error in refusing to admit Chapter 725 of the Iowa Code into evidence. That chapter, entitled "Obscenity and Indecency," defines "obscene material" for the purposes of that chapter, and regulates, *inter alia,* certain aspects of the distribution of such material, such as distribution to minors. Appellant argues that the Iowa Code "is admissible testimony and has relevance as to what the 'community standards' in Iowa are."

The statutory law in Iowa is not controlling on the question of "community standards." Under section 1465, which prohibits the interstate transportation of obscene materials:

> We deal with a federal law which neither incorporates nor depends upon the laws of the states. *United States v. Hill,* 500 F.2d 733 (5th Cir. 1974). Rather, the federal law depends for its constitutionality upon definitions incorporating community standards. Community standards are aggregates of the attitudes of average people—people who are neither "particularly susceptible or sensitive . . . or indeed . . . totally insensitive."

---

11. Those instructions were:

[1] In order to aid and abet the commission of a crime, it is necessary that the supposed aider or abetter act with knowledge that an offense is to be committed.

[2] A person cannot aid or abet a crime which has already been committed.

*Miller v. California, supra,* 413 U.S. at 33, 93 S.Ct. at 2620. The fact that a law of a state permits a given kind of conduct does not necessarily mean that the people within that state approve of the permitted conduct. Whether they do is a question of fact to be resolved by the trial court [this case was tried to the court], and in this case the trial court did resolve it.

*United States v. Danley,* 523 F.2d 369, 370 (9th Cir. 1975), *cert. denied,* 424 U.S. 929, 96 S.Ct. 1143, 47 L.Ed.2d 338 (1976).

The Supreme Court cited the *Danley* holding with approval in *Smith v. United States,* 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977), a case from this court which the Supreme Court affirmed:

> We hold only that the Iowa statute is not conclusive as to the issue of contemporary community standards for appeal to the prurient interest and patent offensiveness. Those are questions for the jury to decide, in its traditional role as factfinder.

*Id.* at 308, 97 S.Ct. at 1767.

The Court also indicated, however, that the admission of state statutory law was permissible, and may have indicated that a defendant was entitled to have a jury consider the same. *See Smith v. United States, supra,* 431 U.S. at 309, 97 S.Ct. 1756.

In this case, while the statute itself was not given to the jury to interpret, the court specifically instructed the jury on it.

As a matter of *law,* the court told the jury:

> In addition, [in determining community standards] you may consider the fact that the Iowa Supreme Court held the Iowa obscenity statutes unconstitutional in 1973 and that the *Iowa State legislature repealed Iowa's obscenity laws with respect to consenting adults in 1974.* (Emphasis added.)

This is a correct statement of the law at that time. *See Smith v. United States,*

*supra,* 431 U.S. at 295, 97 S.Ct. 1756. ("At the time petitioner engaged in the conduct at issue here, Iowa law placed no limits on the distribution of obscene material to adults." *Id.* at 309, 97 S.Ct. at 1768 (Powell, J. concurring).)[12] *See also Chelsea Theater Corp. v. City of Burlington,* 258 N.W.2d 372 (Iowa 1977).

We think the court's instruction to the jury on Iowa law, which was favorable to defendant's position, obviates any error in not admitting the statute into evidence.

*VII.   Submission of Indictment to the Jury*

■ Finally, appellant strenuously objected to the submission of the indictment to the jury, arguing that no opportunity to provide a similar statement was provided to him and that it was extremely prejudicial.

The sum total of the government's response, without citation, is that this is a "common practice" in the Eighth Circuit. We do not agree that it is "common," but it is a practice which is within the sound discretion of the trial court if the jury is properly admonished that the indictment is not evidence of any kind. That was done in this case. *See United States v. McGrady,* 508 F.2d 13, 21 (8th Cir. 1974), *cert. denied,* 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975); *United States v. Warner,* 428 F.2d 730, 736 (8th Cir.), *cert. denied,* 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1970). There was no abuse of discretion here.

*Conclusion*

We have carefully considered the numerous allegations, and finding no reversible error, affirm the conviction.

---

**12.** The crimes committed here occurred in November and December 1974. The Iowa obscenity laws which restricted their application to

dissemination to minors only became effective on July 1, 1974. *Smith v. United States, supra,* 431 U.S. at 295, 97 S.Ct. 1756.